UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

JEANETTE D. GILCHRIST,

                Plaintiff,

v.                                  4:08CV95

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brought this action under 42 U.S.C. § 405 (g) seeking judicial review of the decision of the Secretary of Health and Human Services denying her receipt of disability insurance benefits and supplemental security income under the Social Security Act (SSA). Plaintiff and defendant have both filed motions for summary judgment. The motions were referred to the undersigned United States Magistrate Judge pursuant to provisions of 28 U.S.C. § 636 (b) (1) (B) and (C) and Rule 29 of the Rules of the United States District Court for the Eastern District of Virginia by order of reference entered January 28, 2009.

### I.  STATEMENT OF THE CASE

### A. Procedural Background

Plaintiff filed for disability insurance benefits (DIB) and supplementary security income (SSI) on September 5, 2003, alleging she became disabled and unable to work on August 15, 2003, due to chronic neck, back, and shoulder pain; headaches; and depression. (R.at 105-09.) Plaintiff's application was denied initially and on reconsideration. (R. at 92-99.) Plaintiff filed a request for a hearing before an administrative law judge (ALJ), which was granted, and the hearing was

conducted on November 7, 2005.  (R. at 44.)  Plaintiff was represented by counsel and testified at the hearing, as did a vocational expert (VE). (R. at 44-73.)  On December 20, 2005, the ALJ denied plaintiff's application. (R. at 21-30.)  Plaintiff filed a request for review of the ALJ's decision, but on July 8, 2008, the Appeals Council denied the request, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 7-11.)

On September 9, 2008, plaintiff filed a complaint in this Court appealing the Commissioner's final decision.  On February 27, 2009, plaintiff filed a motion for summary judgment, alleging that the ALJ erred in assessing his residual functional capacity (RFC), failed to consider the mental demands of plaintiff's past work, and posed an improper hypothetical to the VE.  On March 26, 2009, defendant filed a motion for summary judgment.  This matter is now ripe for consideration.

## B.  Factual Background

At the time of the hearing, plaintiff was forty-two years old and classified as a "younger individual" within the meaning of the Social Security Regulations (SSR).  Plaintiff testified that she was divorced and that she lived with her mother and her son in Newport News, Virginia. (R. at 53.)  Plaintiff graduated high school and attended four years of college.  (R. at 137.)

### 1. Medical history

#### a. Treating physicians

Plaintiff was involved in motor vehicle accidents on December 3, 2001; June 25, 2003; and July 1, 2003, and suffered injuries to her cervical and lumbar spine.  (R. at 198.)  On December 4, 2001, plaintiff was seen by Dr. Conrad King for neck and back pain, arising out of the

accident the previous day. (R. at 241.) King noted full range of motion in plaintiff's cervical spine and 75% range of motion in the lumbar spine. He also noted moderate myospasm in the levator scapulae and trapezius muscles bilaterally and marked myospasm of the lumbar paraspinal muscles bilaterally. King performed a straight leg raising test, which he found to be positive at 75% on the right side. King's impression was that plaintiff suffered from cervical and lumbar strain and sprain and possibly from a herniated lumbar disc and radiculopathy. (R. at 241-42.)

On December 11, 2001, plaintiff was seen by King on a follow-up basis. (R. at 239.) King noted that plaintiff's symptoms and signs persisted and that plaintiff was still experiencing severe episodes of spasm. King prescribed Flexeril on an as needed basis for muscle spasms and Tylenol 3 for pain. On December 20, 2001, King noted significant improvement in response to conservative treatment. (R. at 236.) King found that plaintiff had full range of motion in the cervical and lumbar spine, myospasm of the trapezius and sacrospinalis muscles improved to "mild" bilaterally with trigger points still palpable, straight leg raising test was negative to 90% on the left side and 75% on the right, the cervical and lumbar strain and sprain was improving but not resolved, and occipital neuralgia had resolved. (R. at 236-37.)

On January 8, 2002, King noted that plaintiff was responding well to conservative treatment. (R. at 233.) King found that plaintiff had full range of motion in the cervical and lumbar spine; there was no evidence of residual paraspinal myospasm, although plaintiff did manifest some residual tightness in the lumbar paraspinal muscles bilaterally; and trigger points were still palpable. King noted that plaintiff's condition

3

was improving without the need for formal physical therapy or injections, and King planned to continue conservative treatment.   (R. at 233-34.)

On January 16, 2002, x-rays revealed some straightening of cervical spine curvature but no fracture or subluxation, and her lumbar spine x-ray was unremarkable.   (R. at 230-31.)   On January 22, 2002, King noted that plaintiff's range of motion in both the cervical and lumbar spine was between 80 and 90% and that plaintiff was experiencing mild to moderate myospasm in the trapezius and lumbar paraspinal muscles bilaterally with palpable trigger points.   King also noted the x-ray findings of January 16, 2002, which revealed straightening of the normal cervical lordotic curve due to muscle spasm but no other positive findings.   Additionally, King noted that plaintiff "works all day on a computer," without noting any concern that she should not continue to do so.   (R. at 226.)   King recommended that plaintiff continue with physical therapy.[1]

On February 12, 2002, King noted that plaintiff had full range of motion in the cervical and lumbar spine, and she continued to have mild myospasm in the trapezius and paraspinal muscles bilaterally, with trigger points palpable.   King found that plaintiff had a reduced range of motion in her right shoulder (70% to 80% of normal range), as well as tenderness and weakness in the right shoulder.   King also found reduced sensation to light touch in the right C-6 dermatomal distribution. Because of the new symptoms, King ordered an electromyography (EMG) study and an MRI of the cervical and lumbar spine to determine whether any disc

---

[1] Plaintiff attended physical therapy on January 17, 21, 23, 24, 29, and February 4, 2002.   (R. at 172-81; 227-29.)

herniation, radiculopathy, or rotator cuff injuries existed. (R. at 223-24.)

On February 14, 2002, plaintiff underwent an MRI of both the cervical spine and right shoulder. (R. at 250-52.) The MRI of plaintiff's cervical spine revealed central and right paracentral disc herniation with inferior extension of the herniated disc material at C5-C6, as well as thecal sac impingement but no cord compression. The scan also showed abnormal straightening of lordotic curve due to disc herniation. Axial imaging in all areas except C5-C6 was normal, as was the spinal cord and the cranio-cervical junction. The MRI of the right shoulder was unremarkable. (Id.)

On February 19, 2002, plaintiff was seen by Dr. Bruce Grossinger, a neurologist, for examination and an EMG. (R. at 244-46, 222.) Grossinger found that plaintiff's motor nerve analysis was normal and symmetric, late responses were normal and symmetric, and plaintiff's sensory nerve analysis was normal and symmetric. The EMG revealed evidence of moderate right C-6 radiculopathy. Grossinger concluded that plaintiff's radiculopathy was related to her herniated disc which was paracentral to the right with inferior extension and impingement and caused by the 2001 motor vehicle accident. Grossinger injected 20mg Kenalog and 0.5% sensorcaine into plaintiff's trapezius muscles. (R. at 222.)

On February 26, 2002, King noted a 75% range of motion in plaintiff's cervical and lumbar spine and marked myospasm in the trapezius and paraspinal muscles bilaterally with palpable trigger points. King stated that the shoulder exam was unchanged since the previous visit two weeks prior. (R. at 221.) On February 28, 2002, King

signed a certification of medical care slip stating that plaintiff could return to work on march 4, 2002. (R. at 251.)

On March 5, 2002, plaintiff underwent an MRI of her lumbar spine, which was unremarkable. (R. at 253.) On March 12, 2002, King noted that plaintiff's physical examination remained unchanged from the examine of February 26, 2002. King also noted that plaintiff had failed to respond to treatment at that time, and he referred her to Dr. Brian Chandler for chiropractic treatment. King advised plaintiff that she should return to see him on an as needed basis and discharged her from his active care. (R. at 220.) The record is devoid of any evidence as to whether plaintiff was treated by Chandler.

On May 13, 2002, plaintiff was seen by Dr. Bikash Bose, a neurosurgeon. (R. at 182.) After review of the MRI and EMG results, Bose recommended an epidural steroid injection and advised plaintiff to continue with conservative treatment. Bose stated that plaintiff was not agreeable to the steroid injections. The record contains no evidence suggesting that plaintiff ever underwent such injections. (Id.)

On June 11, 2002, plaintiff returned to King, complaining of neck, back, and shoulder pain, particularly while performing her duties while on the job. (R. at 216.) King examined plaintiff and found that her cervical and lumbar range of motion had decreased to 65% to 75% of normal range, the trapezius and paraspinal muscle myospasm had worsened to "marked" bilaterally, and sensation to light touch in the right C-6 dermatomal distribution was reduced. King attributed the worsening symptoms to an acute flare-up of chronic residuals of cervical and lumbar strain and sprain, with central and right paracentral disc herniation at C5-C6 with right C-6 radiculopathy. (Id.) On June 18, 2002, King

6

determined that plaintiff's condition was clinically unchanged since the previous visit one week earlier.  (R. at 215.)

On July 23, 2002, King noted cervical range of motion at 70% to 75% of normal, lumbar range of motion at 80% of normal, moderate myospasm of the trapezius muscles, and mild to moderate myospasm of the paraspinal muscles, both with palpable trigger points.  King also noted residuals of cervical and lumbar strain and sprain, with central and right paracentral disc herniation at C5-C6 with right C6 radiculopathy. (R. at 213.)

On September 3, 2002, King noted essentially the same conditions as the previous visit, with the exception that plaintiff's range of motion had increased to the 75% to 85% in both the cervical and lumbar spine, and the myospasm of the trapezius muscles decreased in severity to mild to moderate range. (R. at 209.)  On October 22, 2002, King noted 70% to 80% range of motion in plaintiff's cervical and lumbar spine, moderate myospasm of the right trapezius muscle, moderate to marked myospasm in the left trapezius muscle, and moderate to marked myospasm in the paraspinal muscles bilaterally.   (R. at 206.)   On December 3, 2002, King found that plaintiff's condition was clinically unchanged since the previous visit and ordered refills of plaintiff's pain medicine and muscle relaxants.  (R. at 204.)

On January 16, 2003, King noted that plaintiff's range of motion was 75% to 85% of normal range in both the cervical and lumbar spine, and he found moderate to marked myospasm bilaterally in both the trapezius and paraspinal muscles.  King attributed the conditions to an acute flare-up of chronic residuals of cervical and lumbar strain and

sprain with disc herniation at C5-C6 and right C6 radiculopathy.  (R. at 202.)

On January 28, 2003, plaintiff underwent a nerve conduction and electromyogram (EMG) study of the right upper extremity, which revealed normal limits.  Plaintiff was unable to tolerate the EMG study, due to the needles.  (R. at 188-89.)

On January 29, 2003, plaintiff underwent an MRI of the cervical spine, which revealed disc herniation and a spur indenting on the dural sac at C5-C6 and a small central disc bulge at C4-C5.  The MRI did not reveal any evidence of acute fracture in the cervical spine.  (R. at 183.)

On January 30, 2003, plaintiff was seen by Dr. Bruce Katz, an orthopedist, who determined that plaintiff had disc herniation in the cervical spine at C5-C6.  Katz ordered an MRI of the lumbosacral spine and an evaluation of plaintiff's right shoulder.  (R. at 186-87.)  On February 8, 2003, plaintiff underwent an MRI of the lumbar spine, which revealed that plaintiff's lumbar spine was normal.  (R. at 184.)

On May 6, 2003, plaintiff returned to King, complaining of continued neck, back, and shoulder pain.  (R. at 200.)  King noted that plaintiff's condition was unchanged since her previous appointment on January 16, 2003. On June 17, 2003, King again noted no change in plaintiff's physical exam. (R. at 199.)  King stated that plaintiff continued to manifest chronic residuals of cervical and lumbar strain and sprain, with a bulging disc at C4-C5, disc herniation at C5-C6, and right C6 radiculopathy.  (Id.)

On July 1, 2003, plaintiff reported to the Emergency Department at Wilmington Hospital, after having been involved in a motor

8

vehicle accident. (R. at 247-49.)  Plaintiff was released from the hospital on the same day with a diagnosis of neck/back strain, due to the accident.  The ER physician wrote her a prescription for eight doses of Valium for muscle spasms and fifteen doses of Percocet for pain.  (R. at 247.)  Plaintiff was instructed to follow up with Dr. King as soon as possible.  (R. at 248.)

On July 14, 2003, plaintiff was seen by Dr. Donald Archer, a rehabilitation specialist, for a defense medical examination.[2]  (R. at 190-92.)  Archer examined plaintiff and reviewed the medical history, including the various diagnostic test results in plaintiff's file. Archer found that plaintiff's physical examination was benign, that her prognosis remained good, and that there were no signs of atrophy in the shoulder girdle.  (R. at 192.)  Archer recommended that plaintiff taper off of the prescription pain medications and that she return to normal activities without any further treatment. Archer disagreed with King's recommendation against resumption of normal activities and encouraged plaintiff to return to her activities.  (Id.)

On July 15, 2003, plaintiff followed up with King, complaining of injuries from two motor vehicle accidents which occurred on June 25, 2003,[3] and July 1, 2003.  (R. at 197-98.)  King noted acute cervical and lumbar strain and sprain resulting from the accidents in 2003, which aggravated residuals from the 2001 accident.  King reported that plaintiff had 50% range of motion in her cervical spine and 40% to 50%

---

[2]  The record states that the examination was requested by Medimax, Inc. but does not indicate the nature of the claim they were investigating.

[3]  There is no emergency room report or police report in the record for this accident.

range of motion in her lumbar spine.  He also reported marked myospasm of the lumbar paraspinal, trapezius, and lavator scapulae muscles bilaterally.  King performed a straight leg raising test and found that plaintiff was negative at 60 degrees bilaterally.  (R. at 198.)  King also noted a decreased sensation to light touch in the right C-6 dermatomal distribution.  (Id.)

On August 12, 2003, plaintiff saw King complaining of continued pain in the neck, back, and shoulder.  (R. at 196.)  King noted that plaintiff's range of motion had improved to 65% to 70% of normal in the cervical spine and 70% to 75% of normal in the lumbar spine.  King also noted that the severity of plaintiff's myospasms had decreased from marked to moderate and that plaintiff's cervical and lumbar strains and sprains were improving but not resolved.  (R. at 196.)

On October 9, 2003, King noted improved range of motion, 80% to 90% of normal in both the cervical and lumbar spine, as well as residual myospasm in the trapezius and paraspinal muscles.  (R. at 195.)  King discharged plaintiff from active care, with instructions to continue self-directed home treatment and to follow-up if her symptoms worsened.  (Id.)

On February 18, 2004, plaintiff was seen by Dr. Ganesh Balu, a pain specialist, for pain in the lower back, neck, and upper right extremity.  (R. at 312.)  Balu concluded that plaintiff was suffering from cervical and lumbar facet syndromes, with underlying cervical radiculopathy.  Balu noted that plaintiff may be suffering from post traumatic stress syndrome and prescribed low dose Ultracets, Lidoderm patches, and Zanaflex for symptom relief.  Plaintiff was seen by Balu's partner, Dr. Kartik Nathan, on March 3, 2004; March 17, 2004; April 19,

2004; May 12, 2004; July 20, 2004; August 24, 2004; and one additional time between the May and July appointments.[4]  (R. at 299, 301-09.)

In conjunction with plaintiff's visit of May 12, 2004, Balu completed a "Pain/Fatigue Residual Functional Capacity Questionnaire" (R. at 303-06.) Balu diagnosed plaintiff with cervical facet arthropathy, tendinitis of the right rotator cuff, and myofascial pain.  (R. at 303.) Balu opined that plaintiff was credible regarding the severity, duration, and frequency of pain, that the pain could be expected to last at least twelve months, and that the pain and fatigue would each prevent plaintiff from performing normal work activities on a frequent (more than four days per month) basis.  (R. at 303-04.)  Balu further opined that plaintiff's narcotic pain medications were likely to cause some side effects such as drowsiness, confusion, and dizziness, but that the side effects would be only "mildly troublesome."  (R. at 304.)  Balu did not believe that "[s]ignificant side expects [could] be expected to limit the effectiveness of work duties . . ."  (R. at 304.)  Balu concluded that plaintiff would only be capable of performing sedentary work for less than two hours per day.  (R. at 306.)

While plaintiff was treating being treated by Drs. Balu and Nathan for back and neck pain, she was also being treated for depression by Dr. Jeanette Zaimes  (R. at 337-54.)  Plaintiff first saw Zaimes on March 18, 2004, at which times Zaimes noted that plaintiff was suffering from decreased energy, decreased sleep, auditory and visual hallucinations, and paranoia.  (R. at 348.)  Zaimes determined that plaintiff was negative for anhedonia and anxiety.  Zaimes diagnosed

---

[4] The documentation of this visit is missing a date. The documentation of the May visit suggested follow-up in one month.  (R. at 302.)

plaintiff with major depressive disorder and prescribed Wellbutrin and Abilify. (R. at 350.) Zaimes discontinued the Abilify prescription on March 25, 2004, after plaintiff complained that it made her irritable. (Id.)

Plaintiff returned to Zaimes for treatment on April 15, 2004; May 19, 2004; June 29, 2004; July 14, 2004; August 20, 2004; and September 21, 2004. (R. at 284; 286-88; 343-44; 346-47). Throughout the course of plaintiff's treatment, Zaimes noted the same symptoms and prescribed several antipsychotic and antidepressant drugs including Risperdal, Seroquel, Geodon, and Wellbutrin. (R. at 337-54.)

On July 5, 2005, plaintiff was examined by Dr. Richard McAdam, a neurologist. (R. at 364-68.) McAdam found that plaintiff was oriented to time, place, and person; that she had good recent and remote memory; and that her attention span, concentration, language, and gait were normal. He also found that plaintiff had a normal fund of knowledge, a stable station, and full strength in all of her muscles, with the exception of a decreased grip in her right hand. (R. at 366-67.) McAdam found no evidence of atrophy in any limbs and no clinical signs of radicular pathology. McAdam noted minimal symptoms of nerve entrapment and of carpal tunnel syndrome in plaintiff's right arm. Additionally, McAdam found edema in plaintiff's lower extremities, which he was concerned might be caused by plaintiff's medications. (R. at 367-68.) McAdam recommended conservative treatment, including an exercise program of walking one-half an hour per day and abdominal strength exercises, use of a cervical traction device, and use of right wrist splint at night for three to four weeks. (Id.)

12

On October 19, 2005, plaintiff was seen by Dr. Anthony Carter, an orthopedist, for ongoing back and neck pain. (R. at 383.) Carter noted that plaintiff had good range of motion in her back, neck, and shoulder and that results of the Adson's and Spurling's signs were negative. Carter stated that plaintiff had palpable tenderness in the trapezius and rhomboid area and some tenderness in the paracervical musculature, with trigger points. Carter noted that plaintiff had full range of motion in her elbows, wrists, and fingers, and that she was neurovascularly intact. Carter determined that plaintiff had chronic neck and back pain, with no focal neurologic compromise, and he prescribed Tramadol and Flexeril. (Id.)

### b. Disability Determination Services (DDS) physicians

On December 15, 2003, a DDS physician[5] performed a residual functional capacity (RFC) assessment on plaintiff. (R. at 254-63.) The physician found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk a total of at least six hours in an eight hour workday, sit for six hours in an eight hour workday, and occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. at 255-57.) The physician further found that plaintiff had no visual limitations; no limitations on pushing, pulling, handling, feeling or fingering; and no communicative limitations. (R. at 255-58.) The physician determined that plaintiff should only reach overhead occasionally but that her ability to reach in other directions was not limited. (R. at 257.) The physician further determined that plaintiff should avoid exposure to extreme cold and vibration but that she had no

---

[5] Physician's name is illegible.

13

other environmental limitations.  (R. at 258.)  The physician opined that the severity and duration of symptoms reported by plaintiff were partially disproportionate to the expected severity and duration of plaintiff's medically determinable impairments and that the alleged effects of the symptoms on plaintiff's function were partially consistent with medical and nonmedical evidence.  (R. at 259.)

On May 11, 2004, Dr. Vinod Keterie, a DDS physician performed another RFC assessment on plaintiff.  (R. at 273-80.)  Keterie found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk at least six hours in an eight hour workday, sit for six hours in an eight hour workday, and occasionally climb, balance, stoop, kneel, crouch, or crawl.  (R. at 274-75.)  Keterie further found that plaintiff had no visual limitations; no limitations on pushing, pulling, handling, feeling or fingering; and no communicative limitations.  (R. at 274, 276-77.)  Keterie determined that plaintiff should limit reaching with her right hand,[6] but otherwise, her ability to reach was not limited.  (R. at 276.)  Keterie further determined that plaintiff should avoid exposure to machinery but that she had no other environmental limitations.  (R. at 277.)  Keterie did not state whether the severity and duration of symptoms reported by plaintiff were proportionate to the expected severity and duration of plaintiff's medically determinable impairments, but did opine that the alleged effects of the symptoms on plaintiff's function were partially consistent with medical and nonmedical evidence.  (R. at 278.)

---

[6] The precise nature of this limitation is illegible in the record.

On August 4, 2004, Dr. William Waid, a DDS psychologist, examined plaintiff and completed a psychological functional capacities evaluation form.  (R. at 289-97.)  Waid estimated that plaintiff had a moderate degree of impairment in her ability to relate to other people, a moderately severe restriction of daily activities, a moderately severe deterioration of her personal habits, and a moderate constriction of interests.  (R. at 291.)  He estimated that plaintiff had a mild degree of impairment in her ability to understand simple, primarily oral, instructions; a moderately severe degree of impairment in her ability to carry out instructions under ordinary supervision; a moderately severe degree of impairment in her ability to sustain work performance and attendance in a normal work setting; a moderately severe degree of impairment in her ability to cope with pressures of ordinary work; and a moderately severe degree of impairment in her ability to perform routine, repetitive tasks under ordinary supervision.  (R. at 292.)  Waid opined that plaintiff suffered from major depression and chronic pain and that the medication she was taking for the conditions induced attention and memory difficulties.  (R. at 291.)  Waid found that plaintiff only suffered from psychotic disorder when she was taking Codeine 4.  Finally, Waid opined that plaintiff was capable of managing money.  (R. at 292.)

On August 31, 2004, a DDS psychiatrist[7] completed a mental residual functional capacity (MRFC) assessment and a psychiatric review technique form.   (R. at 313-30.)   The psychiatrist determined that plaintiff suffered from depressive syndrome, characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased

---

[7]   The name is partially illegible in the file.

energy, difficulty in concentration and thinking, and feelings of guilt or worthlessness.  (R. at 320.)  The psychiatrist found that plaintiff had a moderate restriction in her activities of daily living; moderate difficulty in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and one or two episodes of decompensation per month.  (R. at 327.)  Regarding plaintiff's MRFC, the psychiatrist found that plaintiff had a moderately limited ability to understand, remember, and carry out detailed instructions; a moderately limited ability to maintain attention and concentration for extended periods; a moderately limited ability to interact with the general public; and a moderately limited ability to respond appropriately to changes in the work setting.  (R. at 313-14.)  The psychiatrist found no significant limitation in plaintiff's ability to understand, remember, and carry out simple instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without supervision, work in coordination with others, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of rest periods, or interact appropriately with coworkers.  (Id.)

### 2.  Plaintiff's testimony before the ALJ.

#### a.  Employment history

Plaintiff testified that she completed some college and that she was presently enrolled in a correspondence course on medical billing and coding.  (R. at 53-55.)  Plaintiff stated that she worked as a billing clerk in the credit card department of First USA Bank for approximately seven years, ending in January, 2003. Plaintiff stated that

16

as a billing clerk, she posted payments, processed address changes, and worked on accounts receivable. (R. at 56.) Plaintiff agreed with the VE's assessment that the position was sedentary and semi-skilled. (R. at 70.)

Plaintiff testified that prior to working as a billing clerk, she worked as an assistant manager at a logistics company. (R. at 69.) Plaintiff stated in that position, she was required to sit for approximately three hours in an eight hour workday and moved around the balance of the day. Plaintiff agreed with the VE that the position was light level and semi-skilled. (R. at 70.)

### b.   Impairments

Plaintiff testified that her main impairment is back pain, but she also has pain in her shoulder as well as carpal tunnel syndrome. (R. at 56-60.) Plaintiff stated that her pain is exacerbated by extensive housework, standing too long, walking too far, and climbing stairs. (R. at 60.) Plaintiff did not indicate whether she had any difficulties sitting other than the need to "rock back and forth" at times. (R. at 59.) When asked about depression, plaintiff stated that she suffered from psychosis, including auditory hallucinations. (R. at 63.) Plaintiff testified that her prescription medications cause side effects that include dizziness, swollen ankles, headaches, mood swings, and difficulty with concentration. (R. at 63, 66.)

### c.   Daily activities and RFC

Plaintiff testified that she was able to take care of her personal needs but that she often did not leave her home. (R. at 59, 66.) Plaintiff stated that she was able to walk ten blocks, which is the distance to the grocery store at which she shopped. (R. at 59.)

Plaintiff also testified that she engaged in a number of daily activities, including helping her son get ready for school in the morning, watching TV, doing puzzles, studying, and doing physical therapy exercises. (R. at 54, 58, 65, 67.) Regarding household chores, plaintiff testified that she helped with the grocery shopping, laundry, and cooking, although she did not open jars and often got help with cutting up vegetables. (R. at 58, 59, 61.) Plaintiff also stated that she attended church and that she had completed eight of the twenty four tests required in her correspondence course on medical billing and coding. (R. at 54, 62) Plaintiff stated that she was able to lift between five and ten pounds. (R. at 59.)

### 3. The VE's testimony

The VE testified that plaintiff's former job as an assistant manager was light level and skilled and that plaintiff's former jobs as a remittance processor and billing clerk were both sedentary and semiskilled. (R. at 70.) The ALJ posed two hypotheticals to the VE. (R. at 70-71.) The first hypothetical assumed that the individual possessed an RFC for sedentary work as defined in the regulations. The individual could lift and carry ten pounds occasionally and sit eight hours in an eight hour workday, but she should be allowed an opportunity to change positions. The individual should not engage in climbing or work at unprotected heights and only occasional bending and stooping. The second hypothetical was the same as the first, with an additional limitation the individual would be limited to simple, repetitive job tasks. Considering the two hypotheticals, the VE testified that plaintiff could work as an unskilled office clerk, as an information clerk, or as a surveillance system monitor. (R. at 71-72.) When asked

18

by plaintiff's attorney whether there would be any jobs available for a hypothetical individual who had problems concentrating on a simple task, the VE testified that if the problem were "marked" or "severe" no work would be available. (R. at 72.)

#### 4. **The ALJ's decision**

On December 20, 2005, the ALJ denied plaintiff's application for DIB and SSI. (R. at 21-30.) A preliminary step in determining eligibility for DIB is determining whether the claimant has met the insured status requirements of the Social Security Act (SSA). 42. U.S.C.A. § 416(i) (West 2009). The ALJ found that plaintiff had acquired sufficient coverage to remain insured through December 31, 2007. (R. at 21.)

At step one of the five step evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 15, 2003, plaintiff's alleged disability onset date.[8] (R. at 23.) At step two of the evaluation, the ALJ determined that the medical evidence was sufficient to establish that plaintiff had medical signs and objective findings establishing diagnoses of both depression and cervical degenerative disc disease. The ALJ further determined that the impairments and their symptoms limited plaintiff's ability to perform the exertional and nonexertional demands of work activities, including plaintiff's ability to walk, lift, carry, engage in postural activities,

---

[8] Plaintiff filed a prior application for benefits, which was denied on August 18, 2003. Plaintiff appealed to the Appeals Council, which denied her appeal on May 25, 2005, stating that the additional medical evidence did not provide a basis on which to change the ALJ's determination that plaintiff was not disabled. Thus, plaintiff's alleged disability onset date in her present application does not correspond to the actual onset of any physical or mental condition but, rather, to the day after the date on which she was previously determined not to be disabled. See Gilchrist v. Astrue, Civil Action 4:05CV22 (E.D. Va. 2007).

and understand complex instructions.  Thus, the ALJ found the impairments of depression and cervical degenerative disc disease to be severe.

At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4. (R. at 24.)  The ALJ found that plaintiff's degenerative disc disease did not meet or equal the requirements of section 1.00, dealing with the musculoskeletal system or section 1.04 dealing with disorders of the spine.  The ALJ's conclusion was based on the absence of evidence of compromise of a nerve root or the spinal cord with nerve root compression characterized by motor, reflex and sensory loss, and positive straight leg raising; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudo claudication with inability to ambulate effectively.  (Id.)

The ALJ also found that plaintiff's depression did not meet or medically equal any of the listings in section 12.00, dealing with mental disorders.  The ALJ compared plaintiff's impairment to listing 12.04, dealing with affective disorders like depression, mania, and bipolar disorder.  (R. at 24.)  In order to meet the 12.04 listing, a claimant's impairment must meet both the "A" and "B" criteria or meet the "C" criteria. 20 C.F.R., Subpt. P, App'x 1 (West 2009).  The ALJ found that plaintiff exhibited some of the signs and symptoms listed in paragraph "A" but did not come to a final determination as to whether plaintiff's impairment satisfied Criteria "A."  However, this was not necessary for the ALJ's conclusion because the ALJ found that even if plaintiff's impairment did satisfy Criteria "A," it did not satisfy Criteria "B." Criteria "B," as set forth in listing 12.04 consists of: (1) activities of daily living; (2) social functioning; (3) concentration, persistence,

and pace; and (4) repeated episodes of decompensation. 20 C.F.R., Subpt. P, App'x 1 (West 2009). A five point scale of (1) none, (2) mild, (3) moderate, (4) marked, and (5) extreme, was used to rate plaintiff's activities of daily living; social functioning; and concentration, persistence, or pace. A four point scale of (1) none, (2) one or two, (3) three, and (4) four or more, was used to rate the monthly number of episodes of decompensation. (R. at 24-25.) In order to meet Criteria "B," plaintiff's impairment must result in at least two of the following: (1) marked restriction of daily activities; (2) marked restriction in social functioning; (3) marked restriction in concentration, persistence, or pace; (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R., Subpt. P, App'x 1 (West 2009). The ALJ found that plaintiff had no episodes of decompensation and that she had only mild limitations in activities of daily living; mild limitations in social functioning; and moderate limitations in concentration, persistence, and pace. Accordingly, he found that plaintiff did not satisfy the "B" criteria of listing 12.04. (R. at 25.) Additionally, the ALJ found that the evidence did not establish the presence of any "C" criteria. Since plaintiff's impairments did not meet the criteria of any of the listings, the ALJ determined that she could not be found disabled based on medical factors alone. (Id.)

Prior to proceeding to steps four and five of the five step analysis, the ALJ assessed plaintiff's RFC. (R. at 25-28.) The ALJ determined that plaintiff retained the physical RFC to perform the full range of sedentary work and, more specifically, that she retained the ability to lift ten pounds occasionally, sit for eight hours in an eight hour day, stand and walk for four hours in an eight hour workday and

21

engage in occasional bending and stooping.  (R. at 25, 27.)  The ALJ found that while plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, plaintiff's statements regarding the intensity, duration, and limiting effects of the symptoms were not entirely credible.  (R. at 25.)  The ALJ found that plaintiff's subjective complaints were inconsistent with the medical evidence and with the plaintiff's extensive daily activities such as doing laundry, cooking, and doing grocery shopping.  (R. at 25-26.)

In reaching his conclusion as to plaintiff's physical RFC, the ALJ cited the results of the MRI and EMG, as well as the medical opinions of Drs. King and Carter and those of the DDS physicians.  (R. at 25-28.)  Specifically, the ALJ stated that the cervical MRI revealed paracentral disc herniation at C5-C6 and a bulging disc at C4-C5 with some evidence of thecal sac impingement but no evidence of cord compression; the lumbar MRI was normal; and the EMG showed some evidence of right C6 radiculopathy.  (R. at 25.)  The ALJ went on to discuss the physical examinations, which he stated revealed that plaintiff remained neurologically intact with negative straight leg raising; that plaintiff retained at least partial range of motion in the cervical and lumbar spine; that plaintiff retained normal motor strength, symmetrical reflexes, intact sensation, and a normal gait and station; that plaintiff had improved significantly with conservative treatment; and that plaintiff takes pain medication only on an as needed basis.  (R. at 25-26.)

In determining plaintiff's physical RFC, the ALJ gave little weight to King's medical opinion because of a lack of supporting evidence.  The ALJ stated that King's findings did not establish the

total disability that King concluded plaintiff was under.  (R. at 27.)
The ALJ also gave little weight to Dr. Balu's medical opinion, which the
ALJ stated was also not supported by the medical record.  The ALJ
concluded that while the opinion of the DDS physician that plaintiff
retained the RFC to perform light work was based on evidence in the
record at the time of that determination, new evidence justified the
conclusion that plaintiff's impairments were more limiting. (R. at 28.)

     The ALJ gave no conclusions regarding plaintiff's mental RFC.
(R. at 25-28.)  The ALJ did mention that plaintiff's testimony regarding
watching TV and doing puzzles reflected that her pain was not severe
enough to interfere with concentration; that plaintiff's daily activities
of watching TV, reading the Bible, doing puzzles, cooking, and cleaning
argued against Dr. Zaimes's findings of low frustration tolerance and
decreased energy; and that while plaintiff demonstrated decreased working
and general memory during a consultative psychological evaluation, the
impairments were mild and were likely secondary to her medication.   (R.
at 26.)  The ALJ stated that he gave little weight to Dr. Waid's medical
opinion (a DDS physician) that there was moderate severity in plaintiff's
ability to maintain mental functioning in the workplace.   (R. at 27.)
The ALJ stated that Waid's opinion was inconsistent with his own findings
and with the findings of plaintiff's treating sources, but the ALJ gave
no explanation of how the opinion was inconsistent.  Additionally, the
ALJ did not address in the RFC analysis the extent to which plaintiff's
depression would or would not affect her RFC, despite determining at step
two that plaintiff's depression was severe and limited her ability to
understand and carry out complex tasks.  (R. at 23, 27.)

23

At step four, the ALJ determined that plaintiff could return to her past work as either a remittance processor or billing clerk. (R. at 28.) The conclusion was based on the VE's description of the jobs as sedentary and semi-skilled, both as generally performed and as actually performed, and on the ALJ's own determination that plaintiff retained the RFC for the full range of sedentary work. The ALJ stated that his analysis involved a comparison of plaintiff's RFC with the physical and mental demands of the jobs. The ALJ did not mention any mental limitations in this analysis. (Id.)

At step four, the ALJ's conclusion was apparently based on the assumption that plaintiff had no mental limitations. (R. at 29.) The ALJ began his analysis at step five by making the assumption that plaintiff was only capable of performing simple, repetitive tasks due to depression, which the ALJ determined at step two limited plaintiff's ability to understand and carry out complex tasks. (R. at 23, 29.) At step five, the burden shifts to the Commissioner to show that there are other jobs that exist in the national economy which plaintiff can perform. Based on plaintiff's testimony and the testimony of the VE, the ALJ determined that there are several such jobs. (R. at 29.) The ALJ asked the VE to consider an individual with plaintiff's age, education, relevant past work experience, and RFC for sedentary, simple, and repetitive work. The VE testified that plaintiff would be able to perform the requirements of the occupations of office clerk, information clerk, and security systems monitor and that the jobs existed in significant numbers both in the national and local economies. Accordingly, the ALJ found that plaintiff was capable of making a successful adjustment to

other work that existed in significant numbers in the national economy and was thus not disabled.  (Id.)

### C.  Issue

The sole issue in this case is whether the ALJ's decision that plaintiff is not entitled to DIB and SSI benefits is supported by substantial evidence.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Motion for Summary Judgment Standard

As set forth in Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party can show by affidavits, depositions, admissions, answers to interrogatories, the pleadings, or other evidence, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  Rule 56 mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party is not entitled to summary judgment if there is a genuine issue of material fact in dispute.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party."

Id. In other words, summary judgment appropriately lies only if there can be but one reasonable conclusion as to the verdict. See id.

Finally, as the Fourth Circuit explained,

> [w]e must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove.

Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992)(citations omitted).

## B.  Standard of Review

When an individual makes a claim for DIB/SSI, he or she has the right to a hearing in order to determine whether he or she is disabled. See 42 U.S.C. § 1383(c)(1)(A)(2000). After a final decision has been rendered by the SSA, a party can seek review of the decision by filing a civil action in federal court. See id. at § 1383(c)(3). The factual findings which have been rendered by the Commissioner of Social Security "if supported by substantial evidence, shall be conclusive," and where a claim has been denied, the "court shall review only the question of conformity with such regulations and the validity of such regulations." Id. at § 405(g). The Commissioner's findings with respect to whether an individual is disabled should not be disturbed, even if the court may disagree with them, as long as the findings are supported by substantial evidence, and the correct law has been applied. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." <u>Richardson v.</u> <u>Perales</u>, 402 U.S. 389, 401 (1971)(quoting <u>Consolidated Edison Co. v.</u> <u>N.L.R.B.</u>, 305 U.S. 197, 229 (1938)). In determining what is substantial evidence, the Fourth Circuit has held that substantial evidence exists "[i]f there is evidence to justify a refusal to direct a verdict were the case before a jury. . ." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)(quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).

Specific regulations have been promulgated at the direction of Congress by the Secretary of Health and Human Services for the purpose of making an eligibility determination. <u>See</u> 20 C.F.R. § 416 (2000). The social security regulations (SSR) require the ALJ to conduct a five step sequential evaluation of a disability to determine whether a claimant is entitled to benefits. The five steps which the ALJ must follow are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in the C.F.R. at Appendix 1?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

<u>See id.</u> at § 404.1520/416.920. In reviewing a social security case, the ALJ bears the ultimate responsibility for weighing the evidence. <u>See</u> <u>Hays</u>, 907 F.2d at 1456.

## C. Discussion

A person is eligible for DIB if he or she is insured for such benefits, has not attained retirement age, has filed an application for such benefits, and is under a disability.  See 42 U.S.C. § 423(a)(2000). The code and SSR carefully detail the requirements which a person must meet to be fully insured and eligible for such insurance benefit payments.  See id. at § 423(c).

The SSI program is designed "to assure a minimum level of income for people who are age sixty-five or over, or who are blind or disabled and who do not have sufficient income and resources to maintain a standard of living at the established Federal minimum income level." 20 C.F.R. § 416.110.  Congress has stated that benefits will be paid to an individual if that person is aged, blind or disabled and has limited income or resources which total less than the dollar figure set out in 42 U.S.C. § 1382(a).

While the requirements for these two types of social security benefits differ, the definitions and terms used to determine if a person is disabled and, therefore, eligible for such benefits are the same.  A person is considered disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  Id. at § 423(d)(1)(A).  To be disabled, an individual's impairments must be:

> of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for

28

him, or whether he would be hired if he applied for
work.

Id. at § 423(d)(2)(A).

1. Plaintiff has not been engaged in substantial gainful activity.

The first step in evaluating whether a disability exists
requires a determination of whether plaintiff has engaged in substantial
gainful activity since the onset of the alleged disability.  See 20
C.F.R. §§ 404.1520; 415.920 (2000).  If a claimant is working, and the
work which he or she is doing is considered to be substantial gainful
activity, then the claimant will be found not disabled.  See id. at §§
404.1520(b); 416.920(b).  Substantial gainful activity is defined as
"work activity that involves doing significant physical or mental
activities . . . even if it is done on a part-time basis or if you do
less, get paid less, or have less responsibility than when you worked
before."  Id. at §§ 404.1572(a); 416.972(a); see also id. at §§ 404.1510;
416.910.  In order to be gainful activity, the work activity must be done
for pay or for some type of profit, even if that profit is not realized.
See id. at §§ 404.1510(b); 404.1572(b); 416.910(b); 416.972)b).
Substantial gainful activity does not include daily or recreational
activities, including "taking care of yourself, household tasks, hobbies,
therapy, school attendance, club activities, or social programs. . . ."
Id. at §§ 404.1572(c); 416.972(c).

The ALJ found that plaintiff had not engaged in substantial
gainful activity since August 15, 2003, her alleged disability onset
date.  (R. at 23.)  Plaintiff alleged in her application for DIB and SSI
that her disability began on August 15, 2003.  (R. at 106.)  Plaintiff
also testified that she had not worked since January, 2003.  (R. at 55.)

29

No evidence to the contrary exists in the record.  Therefore, the ALJ's decision at step one is supported by substantial evidence, and the Court will proceed to step two.


### 2.  Plaintiff suffers from a severe impairment.

The second step of the disability evaluation requires the Court to determine whether plaintiff suffers from a severe impairment. See 20 C.F.R. §§ 404.1520(c); 416.920(c)(2000).  If a claimant does not suffer from a severe impairment, then he or she cannot be considered disabled, and thus, he or she is ineligible for DIB.  See id.  To find that a severe impairment exists, a claimant must have "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities. . . ."  Id.  The impairment must be the product of "anatomical, physiological, or psychological abnormalities," and it must be established by "medical evidence consisting of signs, symptoms, and laboratory findings. . . ."  Id. at §§ 404.1508; 416.908.

Examples of basic work activities which must be significantly limited by the impairment include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers, and usual work situations; and

(6) Dealing with changes in a routine work setting.

Id. at §§ 404.1521(b); 416.921(b). The combined effect of all of the impairments which an individual suffers shall be considered together, without regard for whether any one of those symptoms would individually be enough to qualify as a severe impairment. See id. at §§ 404.1523; 416.923. The Supreme Court has held that this step of the disability evaluation is a de minimis threshold. See Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987). The purpose of requiring such a threshold showing of medical severity is to increase "the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." Id. at 153. Accordingly, the severity determination must have "a strictly medical basis . . . without regard to vocational factors." Id. at 151 (quoting the Senate Report accompanying the 1984 amendments.)

The ALJ found that plaintiff has degenerative disc disease and depression, impairments which limit plaintiff's ability to perform the strength and nonstrength demands of basic work activities. (R. at 23.) The medical record shows that plaintiff had been treated for back and neck pain since December of 2001, and that she had objective signs of a herniated disc and a bulged disc at C5-C6 and C4-C5 respectively. (R. at 241, 252, 183.) The medical record also shows that plaintiff was treated for depression with medication and therapy starting in March, 2004. (R. at 348-53.) On August 31, 2004, the DDS psychiatrist determined that plaintiff suffered from depressive disorder characterized by anhedonia, appetite disturbance, sleep disturbance, psychomotor

agitation, decreased energy, feelings of guilt or worthlessness, and difficulty in concentration and thinking. (R. at 320.) The DDS psychiatrist also determined that because of plaintiff's psychological condition, plaintiff was moderately limited in her ability to perform various work-related functions such as understanding, remembering, and carrying out detailed instructions and maintaining attention and concentration for extended periods. (R. at 313.) Thus, substantial evidence exists to support the ALJ's decision that plaintiff suffers from degenerative disc disease and depression and that the impairments are severe. Accordingly, the Court will proceed to step three of the evaluation.

### 3. Plaintiff does not suffer from an impairment or combination of impairments that meets or equals one found in the listings.

The third step of the evaluation requires a determination of whether plaintiff suffers from an impairment or impairments which meet(s) or equal(s) one found in the listings set forth in Appendix 1. See id. at §§ 404.1520(d); 416.920(b)(2000). The listings provide a description "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." Id. at §§ 404.1525(a); 416.925(a). The impairment must have a duration of at least twelve months, unless such impairment is expected to cause claimant's death. See id.; see also id. at §§ 404.1509; 416.909. Without more, a diagnosis that a claimant has an impairment listed in the Appendix does not automatically result in a finding of a disability. See id. at §§ 404.1525(d); 416.925(d). Claimant has the burden to show through medical evidence, such as symptoms, signs, doctors opinions, and

32

laboratory findings, that his or her condition meets the precise criteria set out in the listings for that particular impairment. <u>See id.</u>

If a claimant's impairment or impairments can be found in the listings, or are equal to impairments that are set forth in the listings, a claimant will be considered disabled without considering his or her age, education, or work experience. <u>See id.</u> at §§ 404.1520(d); 416.920(d). A claimant's impairments are medically equivalent to a listed impairment found in Appendix 1 "if the medical findings are at least equal in severity and duration to the listed findings." <u>Id.</u> at §§ 404.1526(a); 416.926(a). In order to make a determination as to medical equivalency, the SSR state:

> We will compare the symptoms, signs, and laboratory
> findings about your impairment(s), as shown in the
> medical evidence we have about your claim, with the
> medical criteria shown with the listed impairment.
> If your impairment is not listed, we will consider
> the listed impairment most like your impairment to
> decide whether your impairment is medically equal.
> If you have more than one impairment, and none of
> them meets or equals a listed impairment, we will
> review the symptoms, signs, and laboratory findings
> about your impairments to determine whether the
> combination of your impairments is medically equal
> to any listed impairment.

<u>Id.</u> Therefore, just because an impairment is not listed within the Appendix, it does not necessarily follow that the claimant's impairment will not be considered a disability. If the listing is met, then a claimant is considered disabled and is entitled to DIB and/or SSI. If a listing within Appendix 1 is not met, then a claimant has the burden to show that he or she is unable to perform past relevant work.

The ALJ found that plaintiff did not have an impairment or combination of impairments severe enough to meet or medically equal an impairment listed in Appendix 1. Plaintiff's degenerative disc disease

is analyzed under section 1.04 of the listings, which covers disorders

of the spine. Section 1.04 requires:

> [C]ompromise of a nerve root or the spinal chord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudo-claudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Subpt. P, App'x 1 (West 2009).

The ALJ found that plaintiff's degenerative disc disease did

not meet the above requirements of section 1.04.  The medical record

reveals no evidence of nerve root compression, spinal arachnoiditis, or

lumbar spinal stenosis. Additionally, the record reveals evidence to the

contrary, including that plaintiff's lumbar spine is essentially normal

and that there is no neurologic compromise or muscle atrophy (R. at 252-

53; 364-68; 383).  The ALJ is precluded from finding that plaintiff's

degenerative disc disease meets or medically equals the severity

described in the listings without evidence of the section 1.04 requirements.

The ALJ also found that plaintiff's depression did not meet or medically equal any of the listings in section 12.00, dealing with mental disorders. The ALJ compared plaintiff's impairment to listing 12.04, dealing with affective disorders like depression, mania, and bipolar disorder. (R. at 24.) In order to meet the 12.04 listing, a claimant's impairment must meet both Criteria "A" and "B" of listing 12.04 or meet Criteria "C." 20 C.F.R., Subpt. P, App'x 1 (West 2009). The ALJ found that plaintiff exhibited some of the signs and symptoms listed in paragraph "A" but did not come to a final determination as to whether plaintiff's impairment satisfied Criteria "A." The ALJ did find that even if plaintiff's impairment satisfied Criteria "A," it did not satisfy the Criteria "B." Criteria "B" are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) repeated episodes of decompensation. 20 C.F.R., Subpt. P, App'x 1 (West 2009). A five point scale of (1) none, (2) mild, (3) moderate, (4) marked, and (5) extreme, was used to rate plaintiff's activities of daily living, social functioning, and concentration, persistence, or pace. A four point scale of (1) none, (2) one or two, (3) three, and (4) four or more, was used to rate the monthly number of episodes of decompensation. (R. at 24-25.) In order to meet Criteria "B," plaintiff's impairment must result in at least two of the following: (1) marked restriction of daily activities; (2) marked restriction in social functioning; (3) marked restriction in concentration, persistence, or pace; (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R., Subpt. P, App'x 1 (West 2009). The ALJ found that plaintiff

had no episodes of decompensation and that she had only mild limitations in activities of daily living; mild limitations in social functioning; and moderate limitations in concentration, persistence, and pace. Accordingly, the ALJ found that plaintiff did not satisfy Criteria "B." (R. at 25.) Additionally, the ALJ found that the evidence did not establish the presence of any "C" criteria. (Id.)

Plaintiff argues that the ALJ's findings with respect to activities of daily living, social functioning, and episodes of decompensation are inconsistent with those of the DDS psychiatrist and that the ALJ does not explain how he weighed the evidence in reaching his findings. Plaintiff argues, and the Court agrees, that the ALJ merely stated his conclusions on the limitations without any explanation. (R. at 24-25.) Nevertheless, the Court finds that there is substantial evidence to support the conclusion that plaintiff's limitations related to depression do not meet Criteria "B." Even accepting the more liberal view of plaintiff's limitations promulgated by the DDS psychiatrist, plaintiff had only moderate limitations in activities of daily living and social functioning and only had one or two episodes of decompensation. (R. at 327.) The level of limitation does not meet Criteria "B." The Court further notes that the ALJ did not analyze Criteria "C," other than to make the conclusory statement that the evidence did not establish the presence of any "C" criteria. (R. at 25.) As plaintiff has not alleged the existence of "C" criteria and as the DDS psychiatrist indicated that the "[e]vidence does not establish the presence of the "C" criteria," the Court finds that the ALJ's conclusion related to "C" criteria is supported by substantial evidence. (R. at 328.)

For the foregoing reasons, the Court finds that the ALJ's finding that plaintiff does not suffer from an impairment or combination of impairments that meets or medically equals one found in the listings is supported by substantial evidence.  Accordingly, the Court proceeds to step four.

4.  <u>Plaintiff is unable to perform past relevant work</u>.

If the impairment experienced by plaintiff does not meet or exceed those set forth in Appendix 1, it is necessary to proceed to steps four and five.  Step four of the analysis requires the Court to compare what plaintiff can still do, despite his or her impairments.  <u>See</u> 20 C.F.R. §§ 404.1520(e); 416.920(e)(2000).  The burden still remains with plaintiff to prove that he or she is unable to perform past relevant work.  <u>See</u> <u>Thorne v. Wienberger</u>, 530 F.2d 580, 582 (4th Cir. 1976).  If plaintiff is found to be capable of performing past relevant work, then he or she will not be considered to be disabled, and the claim will be denied.  However, if plaintiff is unable to return to past relevant work, the analysis proceeds to step five, and the burden shifts to the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.1566, 416.966 (2000).

In determining whether a claimant is able to perform past relevant work, the Court is directed to look at a medical assessment of the individual's RFC.  <u>See id.</u> at §§ 404.1545, 416.945.  The RFC provides the Court with a report of what the individual can still do despite his or her impairments or combination of impairments as well as a vocational assessment of past job requirements.  If a claimant's RFC exceeds requirements of his or her past relevant work, then he or she is determined to be able to return to his or her past relevant work, and the claim can be denied.  <u>See id.</u> at §§ 404.1560(b); 404.1561; 416.960(b);

416.961. However, if a claimant's RFC has been reduced below the requirements of his or her past relevant work, then the test at step four is met, and the evaluation proceeds to step five. <u>See id.</u> at §§ 404.1560(c), 416.960(c).

The ALJ determined that plaintiff retained the physical RFC to perform the full range of sedentary work and, more specifically, that she retained the ability to lift ten pounds occasionally, sit eight hours in an eight hour workday, stand and walk four hours in an eight hour workday, and engage in occasional bending and stooping. (R. at 25, 27.) However, the ALJ failed to reach any conclusions as to plaintiff's mental RFC, despite having found at step two that plaintiff's depression was severe and that it limited her ability to understand and carry out complex tasks. (R. at 23, 27.)

Social Security regulations describe the mental RFC assessment as follows.

> (c) Mental abilities. When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545 (West 2009).

The medical record contains evidence that plaintiff saw her treating psychiatrist, Dr. Zaimes, seven times in 2004, and that he diagnosed plaintiff with major depressive disorder. (R. at 284; 286-88; 343-53.) The record also reveals that plaintiff was examined by two DDS psychological consultants, one of whom was Dr. Waid; a psychologist; and

a psychiatrist whose name is illegible in the record.  (R. at 289-97;
313-30.)  Waid opined, <u>inter alia</u>, that plaintiff suffered from major
depression with a moderate limitation in her ability to relate to other
people, a moderately severe restriction of daily activities, and
moderately severe deterioration of personal habits.  (R. at 291.)  Waid
further estimated that plaintiff had a moderately severe limitation in
her abilities to carry out instructions under ordinary supervision,
sustain work performance and attendance, cope with the pressures of
ordinary work, and perform routine repetitive tasks under ordinary
supervision.  (R. at 292.)  The DDS psychiatrist completed a MRFC
assessment form and a psychiatric review technique form, opining that
plaintiff suffered from depressive syndrome, albeit with a lower estimate
of plaintiff's degree of impairment in many areas as compared to Waid's.
(R. at 313-30.)

        The ALJ stated that he gave little weight to Waid's opinion
because it was inconsistent with Waid's own findings and with the
findings of plaintiff's treating sources.  (R. at 27.)  However, the ALJ
did not explain how Waid's opinion was inconsistent.  The ALJ also did
not discuss the findings of the DDS psychiatrists or explain the weight
he gave them.  The Court finds that the ALJ's RFC analysis is missing
either a statement of what plaintiff's mental limitations are or a
statement that plaintiff is not under any mental limitations.  The Court
notes that either conclusion would require the support of substantial
evidence.

        The Fourth Circuit has held that "unless the Secretary has
analyzed all evidence and has sufficiently explained the weight he has
given to obviously probative exhibits, to say that his decision is

supported by substantial evidence approaches an abdication of the court's duty." Arnold v. Sec'y of Health, 567 F.2d 258, 259 (4th Cir. 1977) (internal quotation marks and citation omitted). Given that the record contains obviously probative evidence of mental limitations and that the ALJ failed to sufficiently explain the weight he gave to this evidence, the Court finds that the ALJ's RFC analysis is not supported by substantial evidence and should be REMANDED for further hearing, consistent with the findings in this report and recommendation.

At step four, the ALJ found that plaintiff could return to her past relevant work, either as a remittance processor or as a billing clerk. (R. at 28.) The ALJ stated that he arrived at his conclusion by comparing plaintiff's RFC to the physical and mental demands of the jobs. In making the comparison, the ALJ relied on his previous RFC analysis that plaintiff retained the RFC for the full range of sedentary work. The ALJ did not consider any mental limitations or include any explanation as to why he did not consider those limitations. Given that the ALJ's RFC analysis is not supported by substantial evidence and that the RFC analysis is a predicate to a proper determination under step four, the Court finds that the ALJ's analysis at step four is not supported by substantial evidence and should be REMANDED for further hearing, consistent with the findings in this report and recommendation.

5. Other jobs exist within the local and national economy which plaintiff could perform.

The fifth step in the analysis considers whether plaintiff can perform any other work available in significant numbers in the national economy, considering plaintiff's age, education, and past work experience. See 20 C.F.R. §§ 404.1566, 416.966 (2000). Step five is

reached when the claimant is not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings but prevents the claimant from performing past relevant work. In assessing plaintiff's ability to perform other work within the economy, the Court will look at exertional limitations, those limitations or restrictions which impact only strength activities, and nonexertional limitations, those limitations and restrictions which impact nonstrength activities such as concentration and ability to follow instructions. See id. at §§ 404.1569(a); 416.969(a). At step five, the burden of proof shifts to the Commissioner to establish that plaintiff has the ability to perform other work. See Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

If a claimant's impairment solely limits his or her physical function, then the Court is directed to conduct an analysis under the medical/vocational regulations. If a claimant's impairment is solely nonexertional or mental, then full consideration must be given to all of the relevant facts of the case and in accordance with the definitions and discussions of each factor in the appropriate section of the SSR. See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a). However, if a claimant suffers from an impairment or impairments causing both exertional and nonexertional limitations, the Court is directed to first determine whether a finding of disability is possible based on the exertional limitations alone. If a claimant would not be disabled based on exertional limitations alone, then the Court should determine whether the nonexertional limitations suffered by the claimant would render him or her disabled. See id. at § 200.00(e)(2).

In the instant case, the ALJ asked the VE to consider an individual with plaintiff's age, education, relevant past work

41

experience, and RFC for sedentary work, with the limitation that the individual was only capable of performing simple, repetitive tasks. (R. at 71-72.) The VE testified that such an individual could work as an office clerk, information clerk, or a security systems monitor and that such jobs existed in significant numbers both in the national and local economies. (R. at 72.) Based on the VE's testimony, the ALJ concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy and accordingly found plaintiff not disabled. (R. at 29.)

The ALJ did not explain why he considered a limitation to simple, repetitive tasks only at step five and not at step four. The ALJ also did not explain how he determined that plaintiff was limited to simple, repetitive tasks. The only clue as to how the ALJ reached this conclusion is his statement in his step two analysis that plaintiff has depression, that it is a severe impairment, and that plaintiff's impairments, _inter alia_, limit plaintiff's ability to understand and carry out complex tasks. (R. at 23.) However, there is no explanation as to what medical evidence the ALJ relied on in determining the limitation. Additionally, there is no discussion of other mental impairments or the potential limitations they may cause. For example, the ALJ found that plaintiff suffered a moderate limitation in her ability to maintain concentration, persistence, and pace but neither added a relevant limitation in this area nor explained why he did not. (R. at 24, 29.)

The Court reiterates that the record contains obviously probative evidence of mental limitations and that the ALJ failed to sufficiently explain the weight he has given th evidence. _See_ _supra_ Part

II.d.   The Court additionally reiterates its finding that because of the deficiency, the ALJ's RFC analysis is not supported by substantial evidence.   Given that the ALJ's RFC analysis is not supported by substantial evidence and that the RFC analysis is a predicate to a proper determination at step five, the Court finds that the ALJ's step five analysis is not supported by substantial evidence and should be REMANDED for further hearing, consistent with the findings in this report and recommendation.

### III.   Recommendation

For the foregoing reasons, the Court recommends that defendant's motion for summary judgment be DENIED and the case be REMANDED for further consideration in accordance with the opinions herein expressed by this report and recommendation.

### IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten days from the date of mailing of this report to the objecting party computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(d) of said rules. See 28 U.S.C. § 636(b)(1)(C)(2000); FED.R.CIV.P. 72(b).

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will

43

result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.    <u>Thomas v. Arn</u>,  474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).


                                                      _____/s/_____
                                                      James E. Bradberry
                                                      United States Magistrate Judge

Norfolk, Virginia

<u>August 25, 2009</u>

Clerk's Mailing Certificate

A copy of the foregoing Report was mailed this date to each of

the following: *Via ECF, AD*

Scott B. Elkind, Esq.
Attorney for Plaintiff
801 Roeder Rd., Ste. 550
Silver Springs, MD  20910

Anita K. Henry, Esq.
Assistant United States Attorney
World Trade Center, Suite 8000
101 West Main Street
Norfolk, VA 23510-1624

Fernando Galindo, Clerk

By _____
             Deputy Clerk

_____, 2009

45